John J. McCall, S.
In this adoption proceeding, the petitioner is the husband of the mother of the two children sought to be adopted. One child is now 11 years of age and the other 14. The mother was divorced from the natural father by judgment made the 8th day of July, 1963 and entered in the office of the Clerk of Albany County the same day. Said judgment became final the 8th day of October, 1963. By virtue of its provisions, the mother was awarded custody of the children, with partial custody to the father on Sundays and the father was directed to pay the sum of $20 weekly for support. On October 19, 1963, the mother married the petitioner and she and the two children have lived together with him as a family unit since that time. After the adoption proceedings had been instituted, a hearing was held, at which time the respondent divorced father, having been duly notified pursuant to section 111 of the Domestic Relations Law, appeared and interposed objections to the adoption. Upon being directed by the court to furnish evidence to substantiate the same, respondent father refused to do so prior to the complete presentation of the petitioner’s case. The order of adoption was granted, an appeal taken therefrom and the Appellate Division reversed and directed a new hearing (24 A D 2d 276). While asserting that it was in the discretion of the trial court to determine the order of proof, the court felt that the dispute herein resulted in an adoption by default and that it could not countenance such a result. A full and complete new hearing has now been held (see 49 Misc 2d 224), with all parties submitting all evidence they desired, and it is on this new record that the court is to make its decision.
Before reaching the merits, a brief word is appropriate as to the applicable law. Heretofore there has been a great deal of apparently irreconcilable conflict as to purpose and effect of those provisions of section 111 of the Domestic Relations Law which state the consent to an adoption shall not be required of a parent who has been divorced because of his or her adultery. It is not to be the task of the court here to reconcile the admitted conflicts, for the Appellate Division, in remitting the matter, laid down its view concerning section 111, all for the end of guiding the new hearing and the courts of the Third Department generally (Matter of Ekstrom, 24 A D 2d 276, 279). By way of summary of the higher court’s pronouncements it is clear that (a) mere interposition of objection by the notified parent does not evoke a requirement of consent, (b) proof of abandonment is not the only way the objection of the parent can be overcome, although such proof can weigh heavily against him, (c) the object of the hearing is to enable the parent to acquaint the court *733 with such information as will aid it in determining whether the moral and temporal interests of the child will be best promoted by the adoption, (d) in reaching any determination, weighty consideration should be given to a parent’s natural rights and the severance of parental ties. The court stressed the fact that neither the ties of blood and parenthood nor the moral and temporal interests of the child are absolutes and each must be given its relative weight in the adjudicative process.
As the court sets out to determine the issue, it is not unmindful of the great significance of the ultimate decision. The present and future status of the filial relationship and the very lives of five people are at stake here. The main portion of the record mirrors the marital life of the parents of the infants here and from the circumstances therein set forth we are asked to pass judgment on the merit of the father’s plea that his parental rights remain undisturbed. In early 1957, when the children were 5 and 2 respectively, the parents separated, the children going with the mother to her original home and the father remaining in the marital abode. Proceedings against the father were instituted in the then Children’s Court of Albany County which resulted in an order of support against the father for the support of the children in the sum of $30 a week. The mother testified he paid this order a few times only and in this respect she was not contradicted. Later in June, 1957, the mother initiated a separation action against the father and a temporary order for support was made and entered October 5, 1957, directing a $30-a-week payment, effective August 9,1957 and directing the payment of counsel fees. Contempt proceedings were instituted against the father in November, 1957, resulting in an order made and entered the 4th day of January, holding the father in contempt for failure to pay support money in the sum of $180 and counsel fees in the sum of $250. The order contained provisions for purging upon the making of certain periodic payments in addition to the regular $30-per-week payment. On April 21, 1958, an order of the Supreme Court was made committing the defendant to the Albany County Jail for failure to comply with the order of January 4 and a warrant of commitment was duly issued. On July 28,1958, an order was made releasing the father from jail upon certain conditions of payment, among which was $180 for support from August 9, 1957 to November 18, 1957. Father was found to be $1,080 in arrears, payment of which was suspended until December 1, 1958. On August 9, payments of $30 a week were to resume, with an additional $10 a week after December 1, 1958, until the arrearage was paid. The order became effective only after a jail sentence imposed by the Justice *734 Court of Colonie expired. There is evidence in this record that the father in February, 1958 had been found guilty as a disorderly person in that he failed to support his children and has been given a jail sentence. On this hearing, the father testified his plea was gulity at the time, but the mother said the findings of guilty came after trial. Apparently at the time of the commitment on the contempt charge in April, 1958 the father was already in jail. All of the foregoing indicates at least an extreme reluctance on the part of the father to support these children' and any money that did come forth was received as the result of the pressure of legal process. The failure to support points up the lack of concern for the children’s welfare. Nothing has here been offered to justify or excuse this failure of performance of parental duty. It is true many of the orders were taken in default, but' currently there is not a shred of evidence to show a different result had the father appeared and contested. The one time he did appear his guilt was established. Admittedly he could not comply with orders to support while in jail, but he was there because he failed to perform the acts he was under order to do.
After being released, beginning in September, 1958 and continuing until July, 1960, the father made $30 weekly payments as evidenced by cancelled checks and registered receipts put in the record. He did miss a few weeks here but there was some effort to act in accordance with duty as the same arose under the order or under the law as it affects parents. However, it is to be noted that for the time he was required to pay $40 a week (December 1, 1958 to January 1, 1961) his remittance was $30. He offers no explanation for noncompliance in this respect. There is still evident in his actions an apparent lack of stability and constancy in his relationship with these children. The lack, we say, is apparent; but in the absence of any proof excusing or explaining this course of conduct, it becomes real.
In February, 1962, the mother and father entered into a formal separation agreement. Apparently the parties wanted to give some formal legal status to a situation that had existed for some years. The father was to pay $20 a week for the children and the mother waived her rights to support. Apparently there was compliance here until July 8, 1963, when the parties were divorced, with custody to the mother, partial custody on Sundays to the father and $20 a week support from the father. The respondent availed himself of his rights and discharged his obligations until March 14, 1964. Divergent versions of the events of that time are related by the parties. It is undisputed that the father submitted a support check on March 14, 1964 and *735 one on March 21, 1964, each containing the legend “ support in full ”. The mother, after receiving legal advice, refused the checks and demanded checks with no qualifying language. The father refused and the mother thereafter refused access to the children. The father swore that at this time the mother told him she did not need the money, and that the children were better off without him and in that way and for that reason refused to recognize custody privileges of the father. The mother, although she may well have been mistaken legally, felt the father had not paid all back support, particularly the deficit of $1,080. The father at this hearing stated “he was not paid in full”, yet admitted the tendering of the checks stating he had. Whether the separation agreement or the subsequent divorce decree support provisions erased past due obligations might be a question, but in this situation, we are examining the father’s state of mind. Financial gain seemed to take precedence over parental obligation that he at least believed to exist. Up to March 14, 1964, the mother accepted the checks and the father had his rights. The cutoff came, she says, with the bad tender. The father swore she arbitrarily cut off rights and refused money. In the view of all the circumstances surrounding the whole event of March 14 and March 21, the court is persuaded that the mother’s statements are the more credible and accepts as true her version.
After March 14, the respondent found himself cut off from his children. If he felt he was wronged, no matter what the mother’s reason, real paternal concern would have been demonstrated by a move to enforce his rights. He swore he consulted an attorney, but could not afford the requested retainer and did not want to accept the proffered suggestion of consulting the Legal Aid Society. He just said he wanted the particular attorney. If at that time he had the love and concern for his children he now proclaims, he would have and could have done more. We are not told the amount of the retainer nor the financial circumstances that would have prevented the father from paying it or any of a reduced amount that might have been requested by such attorney as he did not seek out. This court is of the opinion this man was not too disturbed about Ms custody rights, especially as these were placed in juxtaposition to a saving of $20 a week.
The record shows the children are now settled in a new home with the petitioner and the mother and that this family unit is augmented by a child born of the second marriage. The petitioner desires to assume full responsibility for the children in his position as the head of the new household and gives every *736 indication of being ready, willing and able to discharge the duty he seeks to undertake. The child of 15 has consented to the adoption. The court explained to him the legal effect of the adoption, particularly pointing out that his relationship with his natural father will cease. Proclaiming his love and affection for his father, he still stated he wanted to be adopted. The boy and girl are now in very stable surroundings that are made most pleasant by the presence of a mother’s love, companionship of brother and sister'and economic security. If the court were to stop here, it would have to say that the moral and temporal interests of the children were best promoted by the adoption. In the face of the father’s contention, which under the statute he has the right to plead and prove, that he does not want his parental right extinguished, the court must examine the status of those rights to see whether they still so now exist as to prevent the adoption or they have been “ substantially eroded by abuse, by misconduct or circumstance ”, (Matter of Ekstrom, 24 A D 2d 276, 280, supra.) Each case rests on its own facts. It is the judgment of the court that the past conduct of the father has been characterized by indifference to parental duty, lack of general concern for the welfare of his children, and a performance of obligation only under pressure. It is a harsh act to deny a parent’s prayer, yet it is almost cruel to jeopardize the present or future welfare of the children. The objections of the father are overruled and in accordance with the appropriate provisions of section 111 of the Domestic Relations Law, the adoption is approved without the father’s consent.
Submit separate order in each case.